**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 09-cv-0537-WJM-KLM

JACOB IND,

     Plaintiff,

v.

COLORADO DEPARTMENT OF CORRECTIONS,

     Defendant.

---

## FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

---

On January 6-7, 2014, the Court held a two day bench trial on Plaintiff Jacob Ind's second claim of his operative Complaint, which alleged that the Religious Land Use and Institutionalized Persons Act ("RLUIPA") is violated by the Defendant Colorado Department of Corrections's policy allowing offenders in levels two and three of administrative segregation to possess no more than two personal books at a time.  (*See* ECF Nos. 204, 268 & 269.)  The following are the Court's final findings of fact and conclusions of law.

## I.  FINDINGS OF FACT

**A.    Ind's Incarceration at the CDOC**

1.    Ind is a prisoner who has been incarcerated in the Colorado Department of Corrections ("CDOC") for approximately 21 years.  Transcript ("Tr.") at 55:6-8.

2.    Colorado State Penitentiary ("CSP") is a Level V security correctional institution and is the CDOC's most secure facility for adult male offenders.  It houses the

most violent and dangerous offenders who have proven that they cannot be safely managed in a general population setting. *Id*. at 254:25; p. 256:7-9.

3.      Limon Correctional Facility ("LCF") is a Level IV security facility, housing close-custody and medium-custody offenders. *Id*. at 262:7-15.

4.      LCF is a general population facility and the offenders have most of the same privileges that other offenders have at general population facilities. *Id*.

5.      CSP is home to the CDOC's administrative segregation unit. *Id*. at 268-69.

6.      Currently, there are four levels of administrative segregation at CSP. *See generally id*. at 268-69.

7.      Each level of administrative segregation at CSP comes with certain privileges or restrictions, including property restrictions. *Id*. at 270:6-8, 22-25.

8.      When an offender is placed in administrative segregation, he begins at Level 2. *Id*. at 268:12-13.

9.      After 90 days in Level 2, offenders will be evaluated for progression to Level 3. *Id*. at 268:14-15.

10.     After 90 days in Level 3, offenders are evaluated for progression to Level 4A. *Id*. at 268:15-16.

11.     After completing the "Thinking for a Change" program at Level 4A, offenders progress to a general population facility. *Id*. at 268:17-19.

12.     There is also a Level 4B, similar to Level 4A, which is a long-term level for offenders who progress through Level 3 and are still deemed a security risk and are not ready for general population. *Id*. at 268:20-23.

13. Offenders at Level 4B have more privileges, are allowed to come out in groups of 8 people at a time, can be around staff, and can possess more property. *Id.* at 268:24-25; 269:1-2.

14. Level 4B offenders are not housed at CSP, but rather at Sterling Correctional Facility. *Id.* at 272:15-16.

15. Level 1 in administrative segregation is an optional demotion level that is reserved for offenders who compromise security within the facility. *Id.* at 269:3-8.

16. Offenders at Level 1 are reviewed for progression to Level 2 after 30 days. *Id.* at 269:10-11.

17. In all, administrative segregation is intended to be a temporary program that would ordinarily take nine months to complete. *Id.* at 268:8-9.

18. However, many offenders do not progress quickly through the administrative segregation program.

19. Ind was assigned to administrative segregation at CSP from September 15, 1995 to April 17, 2003 and again from September 17, 2007 until December 3, 2009, for a total of approximately 10 years. Stipulated Facts 3.

20. When this lawsuit was filed, Ind was incarcerated at CSP. Stipulated Facts 2; *see also* Tr. at 55:18-20.

21. While in administrative segregation at CSP, Ind was assigned to administrative segregation Level 1 initially but spent the majority of his time in either Level 2 or Level 3. Tr. at 64:16-25.

22.     Ind was released from administrative segregation at CSP on December 3, 2009, and is currently incarcerated at LCF.  Stipulated Facts 1; *see also* Tr. at 55:3-5.

**B.      Ind's Religious Beliefs**

1.      Ind's Christian Separatist Faith

23.     Ind is a sincere follower of the Christian Separatist faith.  Stipulated Facts 4; *see also* Tr. at 65:20-21, 139:13-140:14.

24.     Christian Separatism is not the same as Christian Identity.  Tr. at 66:9-10.

25.     Under CDOC policies, Christian Separatism falls within the larger religion known as Christian Identity.  Stipulated Facts 5; *see also* Tr. at 66:9-15.

26.     Ind was a follower of Christian Identity from approximately 1994-1995 until he slowly converted to Christian Separatism around 2003-2004.  *See* Stipulated Facts 6; *see also* Tr. at 66:16-20, 137:13-14.

27.     Ind strives to adhere to Christian Separatist teaching.  Stipulated Facts 9.

28.     Ind is an associate member of the Christian Separatist Church Society which is the governing body of all branches of Christian Separatism.  *See* Stipulated Facts 8; *see also* Tr. at 66:21-67:1.

29.     While incarcerated, Ind has donated well over $1,200 to various organizations that promote the religious and secular beliefs of Christian Separatism and/or Christian Identity such as an anti-abortion counseling center and an organization called Save the Children.  Tr. at 67:2-19.

2.      Ind's Need to Engage in Intense Religious Study

30.     The Christian Separatist faith is a research-intensive faith, which mandates

4

intense study from its followers as a fundamental part of the practice.  Stipulated Facts 10; *see also* Tr. at 124:7-9.

31.    Ind sincerely believes that in order to have "a personal relationship with Jesus, [he must] have a personal relationship with God's word, which means he has to truly understand what the word is."  Tr. at 69:15-18.

32.    Ind sincerely believes that he is required to know "what the true faith is and to know what God actually teaches" in order to be "saved from hell" and to ensure that he "[does not] violate scripture."  *Id*. at 68:16-69:10.

33.    Ind sincerely believes that salvation is dependent upon adhering to the correct doctrine and that believing any kind of lie or misinformation, whether religious or secular, can lead to damnation.  Stipulated Facts 11.

34.    Thus, Ind sincerely believes that he must "test all things, hold on to that which is good or true, [and] reject that which is bad or false."  Tr. at 69:23-25.

35.    In fact, the motto of his church—the Christian Separatist Church Society—is "prove all things."  *Id*. at 70:2-3.

36.    This motto is a "way of life" for Ind as a Christian Separatist in that he is required not to hold any beliefs that he has not proven to be true.  *Id*. at 70:4-5.

37.    Because speculation and other people's word "is not proof," Ind is required to engage in study in order to "prove all things."  *Id*. at 70:4-7.

38.    Ind sincerely believes that without being able to study he cannot adequately test or prove what is good and true versus what is evil and false, and that without continuing study of the truth, one ends up opposing the truth and loses salvation. Stipulated Facts 12.

39.     As part of his faith, Ind sincerely believes that God's Truth embodies not just the

        Bible, but also God's natural laws of creation and how to apply biblical and

        natural laws to daily life.  Stipulated Facts 13.

        3.      Materials Ind Needs to Engage in the Necessary Study

40.     To properly practice his religion, Ind believes that he needs a minimum of ten

        books, so long as he can exchange books when he no longer needs them.

        Ideally, Ind would prefer to have fifteen books at once.  Tr. at 75:16-19.

41.     At the time of trial, Ind was using fifteen books at LCF to practice his religion.  *Id*.

        at 76:13-14.

42.     Ind believes that he needs the following ten books at the same time in order to

        properly practice his religion:

        a.      the New Testament and Old Testament in English;

        b.      the New Testament and Old Testament in Greek;

        c.      the Old Testament in Hebrew;

        d.      A Greek lexicon and a Hebrew lexicon;

        e.      A Greek grammar guide and a Hebrew grammar guide; and

        f.      A Bible dictionary.

*See generally id*. at 70:8-75:15.

43.     In order to fully understand the Bible's teachings, Ind requires different versions

        of both the New and Old Testaments of the Bible, including the Greek and

        Hebrew versions, to "understand what God was saying in the language he

        spoke."  *Id*. at 70:19-23.

44.     While Ind speaks English and relies on English translations of the Bible for

6

day-to-day cursory readings, Ind believes that the English translations are "made by flawed man" meaning they are more likely to contain flawed doctrine. *Id*. at 71:4-23; *see also id*. at 126:24-127:1 (Ind explaining that he cannot put his trust in salvation in the "flawed words of man.").

45. For the New Testament, Christian Separatists study two separate books: (1) the Anointed Standard Translation in English; and (2) a Greek version, which was the original language of the New Testament. *Id*. at 70:11-12.

46. For the Old Testament, Christian Separatists study two separate books: (1) an English translation; and (2) the Greek Septuagint, which is the Old Testament translated from Hebrew into Greek 400 years before Christ. *Id*. at 70:13-16.

47. Having a Greek New Testament and a Greek Septuagint is necessary "because that's what [the] English was based on" so "to properly understand the English, sometimes [Christian Separatists] definitely go into the Greek." *Id*. at 70:19-22.

48. Because the Greek Septuagint was translated from the Hebrew Old Testament, Ind believes that it is "very necessary" to also consult the Hebrew Old Testament and the Masoretic Hebrew Texts in "places where the idiomatic Hebrew wasn't translated quite well in the [Greek] Septuagint," in order to properly understand the Greek Septuagint. *Id*. at 70:23-71:3, 126:8-11.

49. Ind believes that the Greek and Hebrew texts provide "a better understanding of what God said" because they allow him to "understand the language he originally spoke in as opposed to [an English] translation which might not encompass the full meaning of God's word." *Id*. at 126:4-18; *see also id*. at 126:19-127:1 (Ind

further explaining that he cannot rely on English translations as the "absolute word of God, because the absolute word of God was the original manuscripts.")

50.    Because Ind is not fluent in Greek or Hebrew, he also needs books that help him translate Greek and Hebrew texts, including: (1) Greek and Hebrew lexicons; and (2) Greek and Hebrew grammar guides. *Id*. at 71:14-73:16.

51.    Moreover, Ind needs theses reference materials in both Greek and Hebrew simultaneously because there are certain phrases in the Greek and Hebrew texts that "didn't get translated just quite right or translated idiomatically into the [Greek] Septuagint of the Old Testament." *Id*. at 73:20-23.

52.    Ind also needs bible dictionaries and bible atlases, to help him understand what certain words in scripture mean, particularly words that are "foreign," and to give him necessary background information. *Id*. at 74:15-22.

53.    For example, if he is studying the Greek Septuagint and "something doesn't seem right," he will have to go to the original Hebrew text—with the aid of a Hebrew lexicon, dictionary, or grammar guide—to understand *"*what they were getting at.*" Id*. at 73:25-74:11.

54.    These reference materials, for example, help differentiate between different people in the Bible that have the same name, they explain cultural practices that are necessary to understand the Bible, and they provide geographical information that is relevant to the proper understanding of the Bible. *Id*. at 74:22-75:12.

**C.     The CDOC's Policies Regarding Inmate Property**

55.     All authorized inmate property, including inmate books, magazines and other

        personal property, must fit within a three cubic feet CDOC-issued duffle bag.

        Stipulated Facts 14; *see also* Trial Ex. A50, AR 850-06 effective November 15,

        2012 at CDOC 00992 (§ IV.G.3).

56.     In addition to the three cubic feet CDOC-issued duffle bag, an inmate is allowed

        to have a two cubic feet box of legal papers.  Stipulated Facts 15; *see also* Trial

        Ex. A50 at CDOC 00992 (§ IV.G.3.a).

57.     Inmates may possess any number of loose papers and files, subject only to the

        personal property maximum of three cubic feet plus two cubic feet of legal

        papers.  Stipulated Facts 22.

58.     These property limitations apply to all inmates, including those housed at CSP

        under all privilege levels, although what an inmate is permitted to have in the

        three cubic feet of space differs based on the facility in which that inmate is

        housed and the inmate's security level.  *See* Stipulated Facts 16; *see also* Tr. at

        146:1-18.

        1.     <u>Possession of Personal Books</u>

59.     Inmates in administrative segregation at CSP are severely limited in the amount

        of property they may possess compared to inmates in general population.  Tr. at

        201:8-20.

60.     One such limitation relates to the possession of personal books; inmates at CSP

        are allowed to possess personal books provided they do not exceed the

allowable book limits as follows:

a.     CSP administrative segregation Level 1 - one book;

b.     CSP administrative segregation Levels 2 and 3 - two books; and

c.     CSP administrative segregation Level 4A - five books.

Trial Ex. A80, I/A 850-06 effective November 21, 2013 at pp. 6 (§ IV.N.3), 11.

61.   While Ind was incarcerated at CSP, inmates in CSP administrative segregation Levels 1 through 3 were allowed to possess two books.  Tr. at 76:11-16, 152:5-9.

62.   The policy has since changed to allow inmates at Level 1 to possess only one book.  *Id*. at 152:10-12.

63.   The number of personal books that an offender in administrative segregation can possess has not otherwise changed.  *Id*. at 152:13-15.

64.   Inmates not in administrative segregation at CSP are allowed to possess fifteen books at any one time.  *Id*. at 147:19-22; *see also* Trial Ex. A50 at CDOC 00997.

65.    Pursuant to the CDOC regulations effective December 3, 2009, Ind could exchange one or both books only once per year and within a set time period once permission for the exchange was obtained from the CDOC.  *See* Stipulated Facts 18; *see also* Trial Ex. A59, I/A 850-06 effective December 3, 2009 at CDOC 01047 (§ IV.L.5.f); Tr. at 77:22-78:1.

66.   The CDOC has since changed its book exchange policy to permit inmates to exchange books on a one-for-one basis.  Stipulated Facts 19; *see also* Trial Ex. A80 at p. 7 (§ IV.N.3.e).  This means offenders can exchange their personal books on a daily basis.  Tr. at 275:6-7.

67.     However, when a book is exchanged, that inmate can never have access to that book again, unless he repurchases it from an approved source supply.  Tr. at 78:9-16.

68.     For instance, an inmate cannot send an exchanged book to his family and then have his family send it back to him when he needs it.  *Id*. at 78:13-16; *see also* Trial Ex. A50 at p. 7 ((§ IV.F.1) (stating that *"*[u]sed books will not be accepted*"* by the CDOC).

    2.     Possession of Library Books

69.     CSP has a library.  Tr. at 79:8-9.

70.     Inmates are not allowed to visit the CSP library but can request library books.  *Id.* at 79:10-16; *see also* Trial Ex. A81, AR 500-01 effective November 1, 2011 at p. 6 (§ IV.C.1.c).

71.     Inmates in administrative segregation at CSP are allowed to possess the following number of library books:

    a.     CSP administrative segregation Level 1 - one library book; and

    b.     CSP administrative segregation Levels 2, 3 and 4A - three library books. Trial Ex. A83, I/A 500-20 effective December 19, 2013 at p. 2 (§IV.3.a.(3)(a)).

72.     Offenders are able to have more library books in administrative segregation than personal books for several reasons, including: (1) the facility controls where the books come from, (2) the offenders only have the books temporarily on a two week basis, and (3) the books are searched at least every two weeks.  Tr. at 318:2-11.

73.     Library books do not count against the book limits or the general property limits

(*i.e.*, three cubic feet of personal property and two cubic feet of legal papers).  Tr. at 195:6-8, 275:17-20, 295:20-22, 303:16-19.

74.  CSP does not permit interlibrary loans, which means an inmate at CSP cannot request library books from a library in a different CDOC facility.  *Id*. at 80:11-18, 192:23-193:21.

75.  In other CDOC facilities, such as LCF, inmates are allowed to check out books from libraries in other CDOC facilities and from local libraries outside of the CDOC.  *Id*. at 80:22-81:4.

76.  Offenders in administrative segregation at CSP can request that books be added to the CSP library collection by submitting a written request to the librarian.  CSP gets funding each year specifically for replacing and adding new books to the CSP library.  Tr. at 285:1-4.

77.  Although inmates at CSP can donate books (such as books they are exchanging) to the library, there is no guarantee that the donation will be accepted and, if it is accepted, there is no guarantee that the book will be kept at the CSP library.  *Id*. at 81:5-17, 194:12-15.

78.  Even if the CSP library has a book that an inmate wants, there is no guarantee that the inmate will actually be able to get that book through library services because the book could be checked out by any of the other 756 inmates.  *Id*. at 193:22-194:9, 249:25-250:2.

3.    Possession of Other Property

79.  In addition to books, inmates in administrative segregation at CSP (Levels 1 through 4A) may possess items from the following non-exhaustive list, subject

only to the personal property limit of three cubic feet plus two cubic feet of legal papers:

a.      Clothing items;

b.      Address book;

c.      Magazine(s);

d.      Newspaper;

e.      Photo album;

f.      Writing tablets;

g.      Flex pens; and

h.      Any number of loose papers and files.

Trial Exs. A50 at CDOC 000992 (§ IV.G.3); A80 at p. 11.

80.   Inmates are also allowed any number of loose papers and files in either the three cubic feet of personal property or two cubic feet of legal papers.  Tr. at 304:11-19.

**D.     The Substantial Burden on Ind's Religion**

81.   While Ind was assigned to administrative segregation at CSP, he was unable to engage in the study that was necessary for his religion because of numerous restrictions that were placed on him by the CDOC.  Tr. at 68:8-15.

82.   Pursuant to one such restriction, Ind was limited to possessing two books during the time he was assigned to CSP.  Stipulated Facts 17; *see also* Tr. at 76:22-24.

83.   The two-book limit affected Ind's practice of his religion by depriving him of "really necessary texts."  Tr. at 108:11-13.

84.   He needed his Bible, including the Old Testament and New Testament, first and

foremost so he had to give up other texts even if that meant he could not properly understand the Bible. *Id*. at 77:7-10.

85. For example, he had to give up his Greek New Testament which meant he could no longer check to see if the New Testament he had in English was an accurate rendering. *Id*. at 108:18-21.

86. He also had to give up reference books which prevented him from understanding and translating Greek words from the Greek Septuagint. *Id*. at 108:17-18.

87. He had to give up books such as the Christian Separatist Catechism, which encompass the foundational teachings of Christian Separatism. *Id*. at 108:22-23.

88. Ind was essentially set back to a "kindergarten" level for his practice and unable to decipher what was true versus what was false. *Id*. at 108:11-109:5.

89. Even though books can now be exchanged at CSP on a one-for-one basis, Ind would still be deprived of the necessary number of books he needs at the same time to practice his religion. Tr. at 78:20-79:1.

90. Moreover, Ind would not be able to afford to keep repurchasing books that he has exchanged. *Id*. at 79:1-7; *see also id*. at 104:19-25 (stating that inmates at CSP earn a maximum of $6.00 per month in prison-related jobs compared to LCF where, for example, Ind earned $140.00 during the month of December 2013).

91. The CSP library contains only two books of general interest to a Christian Separatist:  (1) a reference book called Strong's Exhaustive Concordance that

he would request when it was not checked out by another inmate; and (2) a book called Tracing our Ancestors, which is a book regarding the British Israelite theory that the lost tribes of Israel migrated into Europe and became modern day Europeans.  *Id.* at 79:22-80:10.

**E.     The CDOC's Alleged Compelling Interests for the Book Limits**

92.     The Administrative Regulations themselves, specifically AR 850-06 and I/A 850-06, do not provide any justification for the book limits for inmates in administrative segregation at CSP.  *See* Stipulated Facts 20; *see also* Trial Exs. A43–A50, A55–A61, A80 (all versions of AR 850-06 and I/A 850-06).

93.     At trial, the CDOC provided six purported justifications for its book limits for inmates in administrative segregation at CSP:

a.      To limit the amount of property that staff must search when conducting cell searches;

b.      To make it easier for staff to search property when conducting cell searches;

c.      To increase safety and security by limiting the amount of property that can be used as contraband (such as weapons, body armor, barricades that create trip hazards) and limiting property that can pose a fire hazard;

d.      To limit the amount of property that can be used to hide contraband;

e.      To limit the introduction of contraband into the CDOC; and

f.      To incentivize inmates to improve their behavior so they can progress out of administrative segregation and obtain more privileges.

Tr. at 152:16-154:4, 270:12-21, 278:18-279:15, 280:3-12, 285:16-286:1.

94. The evidence presented by the CDOC to support these six justifications consisted of opinions and beliefs developed after the book limits were already in place. *Id.*

95. None of Defendant's witnesses were able to set forth a reason as to why the two-book limit was adopted.

96. There is no evidence of what the CDOC's actual reasons for the book limits were at the point in time when the book limits were implemented.

**F.   Facts Supporting Those Justifications**

97. Mr. Trani has worked for the CDOC for almost 20 years. *Id*. at 249:7-9.

98. He is currently the warden at CSP and has held that position since March 1, 2012. *Id*. at 249:3-6, 249:14-15.

99. As warden, Mr. Trani oversees the daily operations of the facility and reviews and implements any policy changes that take effect. *Id*. at 250:3-6.

100. Chad Arguello has worked at the CDOC for over 13 years. *Id*. at 198:23-25.

101. Since August 2013, Mr. Arguello has been the basic training captain for the Corrections Training Academy, in which he supervises training for all new CDOC hires. *Id*. at 141:8-22.

102. Staff members at CSP must personally deliver everything to the offenders in their cells, such as meals, toilet paper, and mail, among other things. CSP officers must also escort offenders every time they leave their cells, such as to go to the showers and recreational areas. *Id.* at 263:18-23.

103. The workload for officers at CSP is much higher than it is for officers at a general

population facility like LCF.  In addition to delivering items to inmates and escorting them every time they leave their cell, CSP officers must also perform cell searches and inspections.  *Id.* at 263:7-15.

104.  There are 630 beds at CSP reserved for administrative segregation.  *Id*. at 249:25; 250:1-2.

105.  Each cell in CSP must be searched—at a minimum—on a monthly basis.  *Id*. at 282:2-3.

106.  There are five staff members assigned to each unit at CSP that must conduct all of the routine duties for administrative segregation, including cell and property searches.  *Id*. at 282:4-6.

107.  Two staff members will go into a cell and search all of the offender's property, and check the integrity of the fixtures inside the cell.  *Id*. at 282:10-12.

108.  A primary concern that officials have regarding offender property is contraband introduction, as well as limiting the number of places offenders can hide items. Another concern facing CSP officials is the ability to thoroughly search offenders' property.  *Id*. at 279:22-24.

109.  Contraband consists of weapons and drugs, among other things, which jeopardizes prison security.  *Id*. at 208:20-25.

110.  Every inmate's cell is searched in the same way regardless of the facility's security level.  *Id*. at 97:18-21, 171:13-20, 302:17-22.

111.  Every property item in a cell is searched.  *Id*. at 170:21-23.  The primary function of a cell search is to look for contraband.  *Id*. at 157:25, 158:1-2.

112.   Cell searches entail going into an inmate's cell and searching the inmate's personal property, checking for any discrepancies in the cell such as openings, and checking other items in the cell such as the mirror and sink.  *Id*. at 85:11-16.

113.   Searches are conducted as follows:

a.   Clothing:  Staff will pat down the entire article, check the seams and crease areas where it is easier to hide contraband, check the pockets and zippers, and check for any cuts or tears to the clothing item.  *Id*. at 155:3-18.

b.   Two cubic feet box of legal papers:  Staff will take each of the papers out of the box, flip through the papers, unfold and fold them back if necessary (*i.e.*, if the papers are folded) and then place the papers back in the box.  *Id*. at 155:19-156:22.

c.   Envelope of papers:  To the extent the property includes an envelope of papers in either the three cubic feet of personal property or two cubic feet of legal papers (such as the one used as a demonstrative exhibit at trial), staff will take the papers out of the envelope and rifle through them to check for contraband.  *Id*. at 156:23-157:11.

d.   Envelopes within envelopes:  If the envelope of papers is filled with smaller envelopes that contain papers, staff will take out each envelope and take out the contents of each envelope for searching.  *Id*. at 158:7-19.

e.   Personal books:  Staff will open up the book, check the spine to make sure that nothing is broken and that the glue is not coming apart, open up the inside and back cover of the book, in the case of a hard back book make sure

that nothing in the book has been cut out or hollowed out, and go through the pages. *Id*. at 160:6-14.

    f.     Library books:  Library books are searched in the same way and just as thoroughly as personal books. *Id*. at 195:19-24, 284:14-20.

    g.     Canteen property:  All canteen property, including address books, photo albums, and writing tablets, is searched just like books. *Id*. at 212:13-16; *see also* Trial Ex. A80 at p. 11 (showing that address books, photo albums and writing tables are canteen items).

114.   Every property item is searched just as thoroughly as any other property item. *Id*. at 171:8-12.

115.   However, some items are more difficult to search than others.  Books are amongst the most difficult items to search because of the hard covers and spines.  Tr. at 168:20-25, 169:1-2.

116.   All of the items an inmate is allowed to possess can pose security risks.  *Id*. at 166:22-24.  Many of the items that inmates in administrative segregation at CSP can possess may be used as contraband.  *Id*. at 175:1-4, 176:4-7.  For example:

    a.     Inmates in administrative segregation at CSP are allowed to possess eyeglasses, which can be used as contraband by, for example, taking off the handle and using it as a shank.  *Id*. at 175:5-12.

    b.     CSP administrative segregation Level 2 and Level 3 inmates are allowed to possess a coaxial cable, which can be used as contraband by, for example, taking it apart and twisting the wire to create a knife.  *Id*. at 107:2-5, 175:13-18.

     c.     Inmates in administrative segregation at CSP are allowed to have various loose papers and newspapers which make *"particularly nasty bludgeons [that are] far worse than any books . . . ." Id.* at 107:6-8.

117.    Books (both personal books and library books) also pose a number of security risks:

     a.     Books have been used as body armor. *Id.* at 278:18, 310:19-25.

     b.     Books have been used to assault staff. *Id.* at 278:24, 303:24-304:1.

     c.     Books have been used as barricades during forced cell entries to create trip hazards at the front of the cells. *Id.* at 278:25-279:1.

     d.     Books can pose a fire hazard. *Id.* at 279:2, 304:2-3.

118.    In the past, CSP inmates have also used books to hide contraband by:

     a.     Gluing pages together to hide messages. *Id.* at 158:24-25, 159:1, 4-6, 11-15, 23-25, 160:1.

     b.     Placing items in the spines. *Id.* at 159:2-3.

     c.     Hollowing out portions of the book to hide things such as paper clips, shanks, sharpened objects, contraband, and razors. *Id.* at 163:1-12.

     d.     Folding the pages (earmarking them) to pass or hide dangerous information. *See id.* at 159:9-16.

     e.     Circling words, passing information by writing messages on the pages, and passing notes inside the book. *Id.* at 161:2-6.

119.    Offenders are more likely to hide contraband in books as opposed to letters or other papers because they can manipulate the spine. *Id.* at 168:20-25, 169:1-2.

120.  The more books inmates have, the more opportunities they have to jeopardize security by hiding contraband.  *Id*. at 208:12-15.

121.  Since July 2012, there have been six incidents of contraband hidden in books when they arrived at CSP.  *Id*. at 280:17-18.

122.  In five of those instances, either razor blades or metal rods had been hidden in the books.  *Id*. at 280:19-22.

123.  In one of those instances, an iPhone had been hidden in the book.  *Id*. at 280:23-24.  The iPhone was so well hidden within the book that the offender had it in his possession for several months before it was discovered.  In fact, the contraband was only discovered when a civilian called into the facility to report that the offender had been making drug deals from the iPhone.  *Id*. at 280:23-25; 281:1-5.

124.  Mr. Arguello was not aware of any statistics regarding the number of times an inmate has hidden contraband in a book versus another type of inmate property.  Tr. at 174:18-22.  The CDOC does not maintain those types of statistics.  *Id*. at 174:23-25.

125.  With respect to the introduction of contraband into a prison facility, Warden Trani testified that personal books pose the greatest threat because they are one of the few items sent in from the "streets" to offenders.  *Id*. at 280:22-24; *see also id*. at 209:20-25, 210:1-5.

126.  The majority of CSP offenders' property is limited through canteen services, which is an internal, department warehouse that manages all property coming

into the department.  *Id*. at 202:12-16; *see also id*. at 103:22, 105:1-4.

127.   Canteen services is a system by which offenders can purchase various personal

products—these items are sent in from only approved vendors, and are strictly

controlled and monitored by staff.  *Id*. at 202:16-18.

128.   When offenders purchase canteen items, they are packaged internally within the

CDOC and then shipped to the appropriate facility.  *Id*. at 202:18-21.  The

canteen items arrive at the facility in a clear, sealed bag, before being delivered

to the inmate.  *Id*. at 203:1-11.

129.   Personal books, in contrast, are generally are not purchased through canteen

services, but from outside vendors.  *Id*. at 203:12-13.

130.   Because the vendor merely must have a physical address, the CDOC has little

control over where offenders receive their books from.  *Id*. at 203:12-15.

131.   Book vendors' physical addresses are often fabricated.  *Id*. at 204:2-6.

132.   Mailroom staff "shakedown" books that are sent to CSP and search books using

"e-scan" and "fluoroscope" technology.  *Id*. at 203:12-19.

133.   CSP and Centennial Correctional Facility have two staff members that work in

the mailroom who process, screen, and search all of the facilities' incoming and

outgoing mail and packages.  *Id*. at 283:5-10.

134.   If offenders were allowed to have fifteen (15) books at CSP, as they are allowed

in general population facilities like LCF, it would substantially increase the

workload for CSP staff members.  *Id*. at 282:10-12.

135.   Despite these general security risks and concerns, Ind has never used a book to

manufacture or hide contraband.  *Id*. at 106:16-18, 107:19.

136.   There is no evidence that Ind has ever used a book as body armor, to assault

staff, to create a barricade during a forced cell entry, in a manner that poses a

fire hazard, or to otherwise manufacture contraband.

**G.     The Consideration of Least Restrictive Means**

137.   At CSP, the consideration of policy alternatives and decisions regarding those

alternatives is not a one-person job but rather the job of a policy committee at

the facility comprised of all levels of staff.  Tr. at 286:3-12, 289:25-290:14.

138.   Mr. Trani participates in CSP's regular monthly policy meetings.  *Id*. at 287:6-14.

139.   Mr. Trani has never been involved in any formal policy discussions regarding

increasing the book limits, and he has never personally discussed any

alternatives to the two-book limit in a policy meeting.  *Id*. at 305:8-20,

312:24-313:2.

140.   Mr. Trani has engaged in an informal discussion outside of policy meetings about

increasing the books limits.  *Id*. at 287:15-19, 289:14-23, 305:8-20, 306:8-12.

However, he could not recall any specifics regarding the substance of the

informal discussions or when the informal discussions took place.  *Id*. at

289:11-24, 305:22-23, 306:25-2, 306:14-22, 311:21-312:14, 312:24-313:14.

141.   Mr. Trani did not give any specific reasons why an alternative to the two-book

limit was rejected, but testified that such rejection was based on the experience

of staff who have worked at CSP and "the issues" the CDOC has involving

books, and that the rejection was not in writing.  *Id*.

142.   During a policy meeting that Captain Arguello and several other officials attended, they discussed the two-book policy and informally considered increasing it to three books or decreasing it to one book.  Tr. at 184:5-24, 185:20-25.

143.   Mr. Arguello stated that these brief discussions were "maybe five minutes or less" and did not make "a major impact on [his] memory."  *Id*. at 191:10-11, 191:20-21.

144.   When testifying about the substance of the discussions, Mr. Arguello stated it was "a long time ago" and that he was "speculating on what was said."  *Id*. at 191:19, 191:22-23.  To the best he could recall, Mr. Arguello testified that they decided not to change the personal book limits because the two-book limit, coupled with the one-for-one exchange policy, was an appropriate policy for such a high security level facility.  Tr. at 184:25.

145.   Neither Mr. Arguello nor Mr. Trani could explain why the number "two" [with regard to the limit of books a CSP offender could possess at any one time] was chosen as opposed to a higher or lower number.  *Id*. at 154:5-11, 318:20-319:2.

146.   The CDOC has not conducted any studies on whether a decrease in the number of books makes it easier to search personal property.  Tr. at 172:3-9.

147.   The CDOC presented no specific evidence, in the form of studies or research, which shows that limiting the amount of books actually limits the amount of property that can be used to hide contraband.

## II.  CONCLUSIONS OF LAW

Plaintiff brings this action pursuant to the Religious Land Use Practices and

Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc *et seq*.  In relevant part,

RLUIPA provides that:

> No government shall impose a substantial burden on the
> religious exercise of a person residing in or confined to an
> institution . . . unless the government demonstrates that
> imposition of the burden on that person—
>
> (1) is in furtherance of a compelling governmental interest;
> and
>
> (2) is the least restrictive means of furthering that compelling
> governmental interest.

42 U.S.C. § 2000cc-1(a).

Courts have interpreted RULIPA to create a burden-shifting scheme.  To prevail

on his RLUIPA claim, Plaintiff bears the burden of:  (1) identifying a sincerely-held

religious belief, and (2) showing that Defendant's challenged policy substantially

burdens that belief.  *Abdulhaseeb v. Calbone*, 600 F.3d 1301, 1312-13 (10th Cir. 2010).

If a prisoner can meet these requirements, the burden then shifts to the state to show:

(1) that the policy at issue furthers a compelling government interest, and (2) that

Defendant has employed the least restrictive means of furthering that compelling

interest.  *Id*. at 1318.  The Court will examine each of these elements in turn below.

### A.    Plaintiff's Sincerely Held Religious Beliefs

RLUIPA defines "religious exercise" as including "any exercise of religion,

whether or not compelled by, or central to, a system of religious beliefs."  42 U.S.C.

§ 2000cc-5(7)(A).  To be protected under RLUIPA, the religious practice at issue need

not be fundamental or central to one's belief system so long as the plaintiff has "an honest belief that the practice is important to his free exercise of religion." *Abdulhaseeb*, 600 F.3d at 1301, 1312-13; see also *Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 661-63 (10th Cir. 2006) (religious belief need not be "fundamental").

A plaintiff's claim that the practice is an essential part of his religious faith "must be given great weight." *United States v. Seeger*, 380 U.S. 163, 184 (1965). A court should not "attempt to gauge how central a sincerely held belief is to the believer's religion." *Jenner v. Sokol*, 2013 WL 500400, *3-4 (D. Colo. Feb. 11, 2013).

In this case, Plaintiff testified that his Christian Separatist faith is a research-intensive faith, which mandates intense study from its followers as a fundamental part of the practice. (Tr. at 65:20-21, 124: 7-9; 139:13-140:14.) It is undisputed that Plaintiff sincerely believes that in order to have "a personal relationship with Jesus, [he must] have a personal relationship with God's word, which means he has to truly understand what the word is." (Tr. at 69:15-18.) Thus, Plaintiff sincerely believes that he must "test all things, hold on to that which is good or true, [and] reject that which is bad or false." (Tr. at 69:23-25.) Plaintiff sincerely believes that without being able to study he cannot adequately test or prove what is good and true versus what is evil and false, and that without continuing study of the truth, he will end up opposing the truth and lose salvation. (Stipulated Facts 12.) As part of his faith, Ind sincerely believes that God's Truth embodies not just the Bible, but also God's natural laws of creation and how to apply biblical and natural laws to daily life. Stipulated Facts 13.

On these facts, the Court finds that Plaintiff has shown that he sincerely believes that intense study is important to the practice of his religion.

**B.     Substantial Burden**

In this circuit, "a religious exercise is substantially burdened under 42 U.S.C. § 2000cc–1(a) when a government (1) requires participation in an activity prohibited by a sincerely held religious belief, or (2) prevents participation in conduct motivated by a sincerely held religious belief, or (3) places substantial pressure on an adherent either not to engage in conduct motivated by a sincerely held religious belief or to engage in conduct contrary to a sincerely held religious belief." *Abdulhaseeb*, 600 F.3d at 1315. "'The practice burdened need not be central to the adherent's belief system, but the adherent must have an honest belief that the practice is important to his free exercise of religion.'" *Id*. at 1316 (quoting *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 332 (5th Cir. 2009)).

A mere inconvenience to one's religious practice does not amount to a substantial burden. *See Smith v. Allen*, 502 F.3d 1255, 1278 (11th Cir. 2007); *see also Rocky Mountain Christian Church*, 481 F. Supp. 2d at 1223 (citing *Braunfeld v. Brown*, 366 U.S. 599, 605-607 (1961)). A restriction may be considered only an "inconvenience," where the alleged deprivation was the result of a sporadic or isolated incident. *Gallagher v. Shelton*, 587 F.3d 1063, 1070 (10th Cir. 2009) (holding that isolated violation of kosher restrictions did not support Free Exercise claim). However, a consistent restriction or flat denial of access to something is not a mere inconvenience. *Strope v. Cummings*, 381 F. App'x 878, 882 (10th Cir. 2010) (citing

*Abdulhaseeb* and holding that the flat denial of a halal diet was actionable, while an incident in which a prisoner's meal was rendered inedible was not actionable).

The Court finds that Plaintiff has met his burden of showing that Defendant's book limits substantially burden his sincerely held religious beliefs.  Plaintiff testified that, in order to engage in the level of study required by his religion, he needs access to at least ten books at a time, including: the Old and New Testament of the Bible in English, the Old and New Testament in Greek, the Old Testament in Hebrew, a Greek and Hebrew Lexicon, a Greek and Hebrew grammar guide, and a Bible dictionary.  (Tr. at 70-75.)  Plaintiff testified that the only language in which he is fluent is English, but that the English translations were "made by flawed man" so, to properly understand the author's original intent, it was necessary to refer back to the Greek and Hebrew versions.  (Tr. at 70-71, 126.)  Thus, Plaintiff must have simultaneous access to the English, Greek, and Hebrew versions, as well as materials (such as lexicons and Bible dictionaries) that assist his understanding.  (*Id.*)

Defendant argues that Plaintiff's testimony is insufficient to meet his burden because it is self-serving.  (ECF No. 293 at 25.)  The Court agrees that Plaintiff relies solely on his own testimony to show a substantial burden, but the Court finds that his testimony was credible, despite its self-serving nature.  Moreover, there is no evidence in the record which calls into question the veracity of any of Plaintiff's representations about how his religion is practiced.

Defendant also contends that the record is imprecise as to exactly what Plaintiff needs in order to properly practice his religion.  (ECF No. 293 at 27.)  In support of this argument, Defendant cherry picks seemingly equivocating words used by Plaintiff

28

during his testimony such as his statement that he would "ideally" like to have the Greek and Hebrew versions of the Old Testament in order to practice his religion.  (*Id*.) Defendant also points to evidence showing that Plaintiff was unclear or inconsistent with regard to precisely how many books he needs to practice his religion.  (*Id*.)

While Plaintiff did not specifically demand access to an exact number of books, his testimony was clear that the current personal book limits are insufficient.  Whether Plaintiff's religious practice mandates simultaneous access to ten books or fifteen books is immaterial; Defendant's policy allowed him to possess only two personal books.  Given Plaintiff's uncontradicted testimony, the Court has little difficulty concluding that the restriction of two personal books substantially burdened Plaintiff's religious beliefs.

Defendant also argues that the Court should consider the entirety of its book policies, and that the combination thereof affords sufficient flexibility for inmates.  (ECF No. 293 at 25-26.)  Defendant contends that its one-for-one book exchange policy, coupled with its policy allowing inmates to possess three library books at a time, was sufficient to alleviate any substantial burden on Plaintiff's religious beliefs.  Specifically, Defendant argues that, under these policies, Plaintiff could simultaneously have both the New Testament and the Old Testament as his personal books, and have up to three reference books from the library.  (*Id*. at 26.)

The Court finds that these policies, even considered together, did not alleviate the substantial burden on Plaintiff's religious beliefs.  Plaintiff testified that CSP's library had, at most, two books that he could use to assist the practice of his religion.  Thus, Plaintiff would have been permitted to possess at most four books relevant to his

religious studies at one time.  Based on Plaintiff's testimony, four books was plainly insufficient to allow him to practice his religion.

Moreover, Plaintiff presented evidence that the one-for-one exchange did not assist his religious studies because he needs the reference materials at the same time as the Bibles, so that he can understand the Bibles.  Allowing him to exchange a Bible for a reference volume would not adequately address Plaintiff's dilemma.  Additionally, the record shows that once an inmate exchanges a book, it must be sent out of the facility and cannot be accessed by the inmate again.  Therefore, if Plaintiff gave up his Hebrew Lexicon in order to obtain a Greek Lexicon, he could never access that Hebrew Lexicon again.  As an inmate sentenced to life in prison, with limited access to money to constantly buy new books, it is easy to see how the one-for-one exchange policy did not alleviate the burdens imposed by the two personal book limit.

Finally, Defendant argues that Plaintiff has shown, at most, a preference to have access to more than two books at a time, which is insufficient to meet his burden.  (ECF No. 293 at 28.)  Defendant contends that any burden on Plaintiff's religious practices is incidental or a mere inconvenience, rather than a substantial burden.  (*Id*.)  However, the evidence shows that Plaintiff was not temporarily deprived of the number of books he needs to practice his religion; this deprivation lasted the entire time he was in administrative segregation, which was close to ten years.  Moreover, Plaintiff's undisputed testimony was that vigorous study of religious texts is central to his religion. The law is clear that such wholesale denial of access to an important religious practice is a substantial burden.  *See Strope*, 381 F. App'x at 882 ("flat denial" of an important religious practice is "actionable" under RLUIPA).

30

Accordingly, the Court finds that Plaintiff has met his burden of showing that Defendant's personal book limit substantially burdened his sincerely held religious beliefs.

## C.     Compelling Governmental Interest

Given the above finding, the burden now shifts to Defendant to show that the personal book limits were the least restrictive means of achieving a compelling governmental interest.  *Abdulhaseeb*, 600 F.3d at 1318.

At trial, Warden Trani testified that the personal book limits served three purposes: (1) ensure the safety and security of the staff and officers; (2) control contraband and enable thorough searches of offender property; and (3) allow for an incentive-based program where offenders are rewarded with more privileges for better behavior.  (Tr. at 152-53, 270.)  Warden Trani testified that he felt personal books were the biggest threat to the security of the facility because they were the only items that were sent from unknown vendors.  (*Id*. at 280.)  He also testified that, since July 2012, there have been six incidents where contraband has been hidden in book, including one incident where an iPhone was sent into the facility in the cover of a book.  (*Id*.)

Captain Arguello testified about the difficulty of searching books during a cell search.  (Tr. 158-63.)  He testified that pages can be glued together to hide materials, that the spines can be used to conceal contraband, and that covers can be hollowed out or otherwise manipulated.  (*Id*.)  Captain Arguello testified that, in his experience, offenders are more likely to hide contraband in books than in other papers or letters because they can manipulate the spines of books.  (*Id*. at 168-69.)

There is little doubt that safety and security of a prison is a compelling governmental interest.  *See Cutter v. Wilkinson*, 544 U.S. 709, 722-23 (2005).  Courts applying RLUIPA must act with "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources."  *Id.*

Plaintiff argues that the Court cannot consider the justifications put forth by Defendant for the personal book limits because they are all *post hoc* rationalizations; there is no evidence that these are the reasons the book limits were implemented at the time policy was adopted.  (ECF No. 292 at 54.)  The Tenth Circuit has never explicitly held that a defendant must state the compelling governmental interest behind a restriction at the time that restriction is imposed.  However, it recently observed that "factually unsupported 'post-hoc rationalizations'" are not sufficient to meet the Defendant's burden in a RLUIPA case.  *Yellowbear v. Lampert*, 741 F.3d 48, 58 (10th Cir. 2014); *see also Abdulhaseeb*, 600 F.3d at 1318 (holding that "post-hoc rationalizations will not suffice" to meet the requirements of RLUIPA).  Additionally, most other courts to have looked at this issue have held that the compelling governmental interest must be asserted at the time the regulation is adopted.  *See Native Am. Council of Tribes v. Weber*, 897 F. Supp. 2d 828, 849 (D.S.D. 2012) ("Because post-hoc rationalizations provide an insufficient basis to find a compelling governmental interest, the court must look to the compelling interest asserted by defendants at the time of the ban."); *Kalwasinski v. Maxymillian*, 2010 WL 5620908, *6

(N.D.N.Y. Dec. 23, 2010) ("[T]he legitimate penological interest advanced must have been the <u>actual</u> reason from the defendants' actions.") (emphasis in the original).

The Court agrees with the reasoning set forth in these cases.  In enacting RLUIPA, Congress chose to subject prison regulations which substantially burden an inmate's religious beliefs to the "most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 545 (1997).  This decision has significant ramifications for the Court's analysis.  "Whereas rational basis review permits a court to hypothesize interests that might support a decision, RLUIPA's strict scrutiny standard requires courts to consider only the actual reasons for a decision." *Ciempa v. Jones*, 745 F. Supp. 2d 1171, 1194 (N.D. Okla. 2010) (internal citation and quotation omitted).

In this case, all of the reasons for the personal book limits put forth by Defendants are *post hoc* justifications.  Defendant's witnesses testified about the purpose they believe the personal book limits serve at the current time.  But no witness was able to testify about why the personal book limits were imposed in the first instance.  Moreover, perhaps the most compelling reason for the limitations on personal books—to limit the introduction of contraband into the facility—was only put forth as a compelling governmental interest for the first time at trial.  (*Compare* ECF No. 198 with Tr. 280.)  This is the definition of a *post hoc* justification which the Court is not permitted to consider.  *See United States v. Virginia*, 518 U.S. 515, 533 (1996) (applying the lesser standard of intermediate scrutiny and holding that the state's "justification must be genuine, not hypothesized or invented *post hoc* in response to litigation.").

If the Court evaluated the personal book limits under the rational basis standard,

the Defendant's justifications would suffice as it has plainly shown that the personal book limits further its interest in ensuring prison safety and security.  However, RLUIPA requires more.  Defendant failed to produce any evidence as to the actual reason for adopting the personal limits at the time they were imposed and has therefore failed to meet its burden of demonstrating a compelling governmental interest that is furthered by the personal book limits.

**D.      Least Restrictive Means**

Even if the Court were permitted to accept the Defendant's *post hoc* justifications for the personal book limits, Defendant would still be required to show that the two-book limit is the least restrictive means of serving its compelling governmental interest. Under this prong, the Court will address the following issues: (1) support for the chosen policy; (2) consideration of less restrictive alternatives; and (3) consideration of an individualized accommodation for Plaintiff.

1.      <u>Support for the Two-Book Limit</u>

To meet its burden under the least restrictive means test, Defendant must first introduce evidence which supports its choice of regulation.  *Al-Amiin v. Morton*, 528 F. App'x 838, 844 (10th Cir. 2013).  In order to support its choice of regulation, the Defendant must, at a minimum, offer some explanation as to why the two-book limit was adopted.  It has utterly failed to meet this requirement.  The record is devoid of any evidence as to why inmates are limited to two books, as opposed to one or three (or ten as Plaintiff requests).  Both Captain Arguello and Warden Trani were asked if they knew why officials chose two as the number of personal books that an inmate could safely possess, and neither was able to provide any reason. (Tr. at 154, 318-19.)

Thus, the Court finds that Defendant has failed to introduce sufficient evidence to support its choice of regulation.

    2.    <u>Consideration of Less Restrictive Means</u>

A state must show that it actually considered and rejected other, less restrictive alternatives before adopting the challenged policy.[1] *See Couch v. Jabe*, 679 F.3d 197, 202-04 (4th Cir. 2012) ("[T]he Government must consider and reject other means before it can conclude that the policy chosen is the least restrictive means."); *Spratt v. Rhode Island*, 482 F.3d 33, 40-41 (1st Cir. 2007) ("A prison cannot meet its burden to prove least restrictive means unless it demonstrates that it has actually considered and rejected the efficacy of less restrictive measures before adopting the challenged practice."); *Washington v. Klem*, 497 F.3d 272, 284 (3d Cir. 2007) ("[T]he phrase 'least restrictive means' is, by definition, a relative term.  It necessarily implies a comparison with other means.  Because this burden is placed on the Government, it must be the party to make this comparison."); *see also Jova v. Smith*, 582 F.3d 410, 416 (2d Cir. 2009); *Warsoldier v. Woodford*, 418 F.3d 989, 999 (9th Cir. 2005).  *But see Knight v. Thompson*, 723 F.3d 1275, 1286 (11th Cir. 2013) ("RLUIPA asks only whether efficacious less restrictive measures actually exist, not whether the defendant considered alternatives to its policy.").

On this point, the record shows that Captain Arguello participated in one informal conversation, at or following a policy meeting, in which he and a few other people

---

[1]  Though the Tenth Circuit has never explicitly addressed this point, because of the wide consensus among the other circuits, the Court finds that this requirement is applicable here.

discussed either raising or lowering the personal book limits.  (Tr. at 184-85.)  He could

not recall the specifics of the conversation, but believed that these correctional officials

decided to leave the two-book limit the same because they felt that this limit, in

combination with the one-for-one book exchange policy, was appropriate for the

custody level and security level of the facility.  (*Id*. at 185.)  Warden Trani testified that

there were informal discussions about raising the book limit to three, but that was "ruled

out" based on the "experience of [Defendant's] staff that have worked in that facility and

based on the issues that we have involving books."  (Tr. at 289.)

       The Court finds that Defendant failed to meet its burden of showing that less

restrictive alternatives to the two-book limit were actually considered and rejected.

First, as with the asserted governmental interests, Defendant has, at most, shown that

less restrictive alternatives have been considered in the years after the two-book limit

was adopted.  This consideration is *post hoc* as neither Captain Arguello nor Warden

Trani testified about whether any alternatives were considered at the time the two-book

limit was implemented.  Some courts have held that consideration of alternatives after a

restriction is in place is not sufficient.  *See Lindh v. Warden*, 2013 WL 139699, *14 (D.

Ind. Jan. 11, 2013) (finding that the warden failed to "legitimately consider" alternatives

to a total ban on congregate prayer because he only looked at other options after the

ban had been implemented).

       More significantly, Warden Trani testified that policies such as the two-book limit

are formed by policy committees, which look at the current Administrative Regulations

and consider suggested changes and possible alternatives.  (Tr. at 286.)  Revising

policies is not a one person job, but is the work of a policy committee comprised of all

levels of staff, with ultimate review by the Warden.  (*Id*. at 290.)  There was no evidence that any alternatives to the two-book limit were considered during by a policy committee during any formal meeting.  Given the formality required to enact or change a regulation, the Court finds that the informal discussions regarding raising the book limits to three books are not sufficient to show that Defendant actually considered and rejected less restrictive alternatives.

Finally, Defendant failed to offer any reasoned explanation as to why any alternatives were rejected.  "[T]o meet the least restrictive means test, prison administrators generally ought to explore at least some alternatives, and their rejection should generally be accompanied by some measure of explanation."  *Spratt*, 482 F.3d at 41 n.11.  The only explanation offered for rejecting a higher personal book limit was the combined staff experience and the "issues" Defendant has with personal books.  (Tr. at 289.)  This is not a sufficient basis to reject a less restrictive alternative.  *See Yellowbear*, 741 F.3d at 60 ("'The state must do more than simply offer conclusory statements that a limitation on religious freedom is required for the security, health or safety in order to establish that its interests are of the highest order.'") (quoting *Werner v. McCotter*, 49 F.3d 1476, 1480 (10th Cir. 1995)); *see also Koger v. Bryan*, 523 F.3d 789, 800 (7th Cir. 2008) ("We can only give deference to the positions of prison officials . . . when the officials have set forth those positions and entered them into the record.").

For all of these reasons, the Court finds that Defendant has failed to meet its burden of supporting the choice of the two-book limit.

3.     Consideration of an Individualized Accommodation

In a recent case, The Tenth Circuit held that RLUIPA requires that the government "prove the 'compellingness' of its interest in the context of 'the burden on *that person*'—suggesting an inquiry that proceeds in light of the particular burden the government has placed on the particular claimant." *Yellowbear v. Lampert*, 741 F.3d 48, 57 (10th Cir. 2014) (quoting 42 U.S.C. § 2000cc-1(a) (emphasis in original). "[A] court does not consider the prison regulation in its general application, but rather considers whether there is a compelling government reason, advanced in the least restrictive means, to apply the prison regulation to the individual claimant." *Kikumura v. Hurley*, 242 F.3d 950, 962 (10th Cir. 2001).

Defendant has consistently approached this litigation from the viewpoint of the overall prison population, arguing that whatever action it takes towards Plaintiff will have to be generally applied to the entire inmate population in administrative segregation. For example in its post-trial briefing, Defendant argues that the Court "faces the possibility of setting dangerous precedent or a slippery slope" by permitting a plaintiff's specific, individualized religious beliefs to inform policy at a correctional institution. (*See* ECF No. 293 at 25.)  While the Court is sympathetic to Defendant's argument, it cannot change the law.  RLUIPA requires the government to look at the specific prisoner and attempt to accommodate that prisoner's religious beliefs.  *See Love v. Reed*, 216 F.3d 682, 691 (8th Cir. 2000) (rejecting state's argument that it should not have to provide a meal that met a prisoner's dietary preferences based on his religious beliefs because it would cause other inmates to make similar requests).

There is no evidence that Defendant ever considered whether it could grant Plaintiff a religious exemption to the two-book limit, or whether other less restrictive measures could be put in place to accommodate Plaintiff's sincerely held religious beliefs.  There is also no evidence that Defendant considered Plaintiff's individualized security concerns or his past behavioral issues in choosing not to accommodate his religious beliefs.  While Defendant showed that books can be used in a variety of ways that threaten prison security, there is no evidence that Plaintiff ever used books in this manner.  With respect to contraband, there was a lot of evidence at trial that personal books were a recognized source of contraband in prison, but there was no evidence that Plaintiff's books had ever introduced contraband into his correctional facility.  There was also no evidence that Plaintiff has ever used books as body armor, assaulted staff with his books, set fire to his books, used his books as a barricade, or attempted to pass messages through his books.  Thus, Defendant has failed to show how restricting the number of personal books possessed by this particular Plaintiff furthers its compelling governmental interests.  *See Yellowbear*, 741 F.3d at 57 (the Court must ask "whether the government's particular interest in burdening this plaintiff's particular religious exercise is justified in light of the record in this case.")

**E.     Conclusion**

In sum, the Court finds that Plaintiff presented sufficient evidence at trial to meet his burden of showing that his sincerely held religious beliefs were substantially burdened by the policy restricting inmates in Levels 2 and 3 of administrative segregation to possession of two personal books at a time.  The Court finds that Defendant has failed to meet its burden of showing that the two-book limit is the least

restrictive means of furthering a compelling governmental interest.  The government interests asserted by Defendant are all *post hoc* justifications for its chosen policy and are generalized to the prison population overall.  There is no evidence that Defendant considered less restrictive alternatives in general, or that it considered less restrictive alternatives to accommodate Mr. Ind's individual religious beliefs.

Because Defendant has failed to meet its burden, the Court concludes that Plaintiff has shown a violation of RLUIPA.  As relief for prevailing on this claim, Plaintiff asks that the Court enjoin the CDOC "from continuing its current policy limiting the number of books inmates housed in administrative segregation at CSP may possess at any one time."  (ECF No. 292-1.)  Plaintiff asks that the Court instead order the CDOC to incorporate into its current regulations a policy that permits all offenders in administrative segregation at CSP to "possess as many personal books as they like, so long as they fit within the maximum amount of personal property".  (*Id.*)

Although the Court has found that Defendant's two-book limit violates RLUIPA in this case, the Court declines to award Plaintiff the relief he seeks.  As discussed above, RLUIPA is an individualized statute which requires the government to attempt to accommodate an inmate's personal religious beliefs.  The relief proposed by Plaintiff would invalidate the two-book limit as to all offenders, even though Plaintiff has only shown that it substantially burdens his personal religious beliefs.  Because Plaintiff has not shown that the two-book limit would violate the sincerely held religious beliefs of all inmates, the Court will not invalidate the provision overall.  Instead, the Court rules only that Defendant is enjoined from enforcing the two-book limit against Plaintiff, should he be returned to administrative segregation at CSP.

### III.  PREVAILING PARTY

At trial, Plaintiff also made an offer of proof as to why he should be declared the prevailing party on claims 1 and 4.  (*See* ECF No. 268 at 4.)  Claim 1 challenged Defendant's policy that did not allow inmates in administrative segregation to participate in religious correspondence courses.  (ECF No. 103 at 4.)  Claim 4 challenged Defendant's policies prohibiting inmates in administrative segregation from engaging in communion.  (*Id*. at 7-8.)  Plaintiff dismissed Claims 1 and 4 before trial because, while this case was pending, Defendant removed the ban on religious correspondence courses and changed the policy such that he would be able to take communion if he is sent back to administrative segregation.  (*See* ECF No. 260.)  Plaintiff argues that he is the prevailing party on Claims 1 and 4 because Defendant changed its policies in response to this litigation.  (ECF No. 283 at 5-11.)

As set forth above, the Court has ruled in Plaintiff's favor on the second claim raised in his Amended Complaint, which challenged the book limits on offenders in administrative segregation at CSP.  (ECF No. 103.)  Thus, Plaintiff is clearly the prevailing party on this claim for purposes of 42 U.S.C. § 1988(b).  In cases like this where a plaintiff achieves partial success on his claims, the Court has discretion to award fees not only for the claim on which the plaintiff succeeded, but also for all related claims.  *See Browder v. City of Moab*, 427 F.3d 717, 722-23 (10th Cir. 2005) (a plaintiff that achieves partial success can recover attorneys fees for the claim on which he prevailed and those related to it).

Plaintiff's claims in this case were all brought under RLUIPA, and involved a

common core of facts in that they required the Court to consider Plaintiff's religious beliefs and the impact of Defendant's policies governing inmates in administrative regulation on those beliefs.  Thus, the Court finds that all of the claims brought in this case are sufficiently related to the claim on which he prevailed at trial, so that Plaintiff will be able to recover his reasonable attorneys' fees expended in prosecution of all claims.

Because the Court finds that Claims 1 and 4 are sufficiently related to Claim 2 so as to entitle Plaintiff to recover attorneys' fees on those claims, Plaintiff's oral Motion to be declared the prevailing party on Claims 1 and 4 is denied as moot.

## IV.  CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.      Plaintiff has shown that Defendant's enforcement of its book limitations policy, set forth in I/A 850-06, against him individually, substantially burdens his sincerely held religious beliefs in violation of RLUIPA, and judgment shall enter in favor of Plaintiff on Claim 2 of his Amended Complaint;

2.      Should Plaintiff return to administrative segregation at CSP, Defendant is enjoined from enforcing against him its current book limitation policy, set forth in I/A 850-06;

3.      As Plaintiff is the prevailing party on Claim 2, which is related to all other claims brought in the Amended Complaint, Plaintiff is entitled under 42 U.S.C. § 1988(b) to an award of his attorneys' fees and costs reasonably expended in prosecution of his claims in this action;

4.      Plaintiff shall file a Motion for Attorneys' Fees and Costs, with the required

supporting documentation, no later than April 18, 2014;

5.    Given the Court's ruling in Plaintiff's favor, Defendant's mid-trial Motion for

Judgment as a Matter of Law is DENIED;

6.    Given the Court's ruling on his other claims, Plaintiff SHALL NOTIFY the Court

by April 15, 2014 as to whether he wishes to persist in his Motion for Order to

Rescind the Settlement Agreement and Vacate the Dismissal of Claim 5 (ECF

No. 278).  Because this Motion seeks to reopen a previously-dismissed claim,

the Court construes it as a post-judgment Motion that does not warrant

withholding the entry of judgment on the Amended Complaint.

Dated this 31st day of March, 2014.

BY THE COURT:

William J. Martinez
United States District Judge